IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| MULTI-COLOR CORPORATION, | : |
| *Plaintiff*, | : Case No. 1:24-cv-00069 |
| vs. | : Judge Jeffery P. Hopkins |
| MARK GIULIANI, | : |
| *Defendant*. | : |

## ORDER

This matter is before the Court on the Amended Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 7) (the "Motion") filed by Plaintiff Multi-Color Corporation ("MCC") against Defendant Mark Giuliani. The parties appeared before the Court by telephone on February 15, 2024, during which time Mr. Giuliani proceeded *pro se*. For the reasons set forth below, the Motion is hereby **GRANTED**.

**I. BACKGROUND**

MCC is an Ohio-based corporation that manufactures and develops premium labeling solutions on a global scale. Doc. 1, ¶ 1, 5. Mr. Giuliani was hired as an account manager for MCC in 2017. *Id.* ¶ 8.

As an account manager, Mr. Giuliani was responsible for the pressure sensitive product line and worked with customers across the country and internationally. *Id*. In this role, he was tasked with "making sales, negotiating pricing and terms, managing customer relationships, and building business with his accounts." *Id.* He had access to "product development information, manufacturing methods, technologies, pricing and margin

1

information, customer preferences, competitive strategies, and a wide variety of other sensitive information." *Id*. He was required to enter into an At-Will Employment, Confidential Information, Restrictive Covenant, and Non-Disclosure Agreement (the "Agreement") (Doc. 7-1). *Id*. ¶ 10.

On January 16, 2024, Mr. Giuliani submitted a two-week notice. *Id*. ¶ 13. MCC subsequently learned that Mr. Giuliani accepted a position with Inovar Packaging ("Inovar"), a direct competitor. *Id.* MCC then terminated his employment on January 22, 2024. *Id*. On that date, MCC conducted an exit interview with Mr. Giuliani, and reminded him "of his Agreement, and the obligations contained in it, and advised him that he was not permitted to take a similar position with a direct competitor." *Id.* ¶ 14. Mr. Giuliani "acknowledged that he intended to go work for Inovar," and "admitted that he had shared his Agreement with Inovar." *Id.* Mr. Giuliani was informed that he had to return his company-issued laptop and all MCC property. *Id.* ¶ 15. It took Mr. Giuliani a total of 14-days to return the laptop. *Id.*

MCC received Mr. Giuliani's company-issued laptop on February 5, 2024. *Id.* ¶ 17. Upon receipt, IT personnel discovered that, on the eve of submitting his resignation, Mr. Giuliani downloaded confidential, proprietary, and trade-secret information for more than a dozen customers onto an external storage device. *Id*. ¶ 16. That information included detailed pricing lists, customer lists, product specifications, and order histories. *Id.* A forensic examination conducted by a third-party immediately thereafter confirmed that Mr. Giuliani had used a Seagate large capacity storage device to download the information. *Id*. ¶ 17. The examination further revealed that BitLocker, an encryption software, had been installed onto the laptop in what MCC believes "was a blatant attempt [for Mr. Giuliani] to cover his tracks." *Id*.

On February 7, 2024, Mr. Giuliani submitted a signed Certification Regarding Return of Confidential Information affirming that he had returned all company property and information to MCC. *Id.* ¶ 18. During the conference held before the Court on February 15, 2024, Mr. Giuliani represented that he no longer possessed any information, and his comments suggested that he may have deleted the information from the storage device. It was also confirmed that Mr. Giuliani is currently in training at Inovar.

## II. LAW & ANALYSIS

A party may seek injunctive relief when there is reason to believe that they will suffer irreparable harm or injury while the suit is pending. Fed. R. Civ. P. 65. Injunctive relief is "an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation marks omitted) and should "only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The purpose of such relief is to preserve the status quo "so that a reasoned resolution of a dispute may be had." *Proctor & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996).

When determining whether to grant or deny injunctive relief, courts consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Blue Cross & Blue Shield Mut. of Ohio v. Columbia/HCA Healthcare Corp.*, 110 F.3d 318, 322 (6th Cir. 1997). Importantly, these are factors to be balanced, not prerequisites to be met. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

### a. Likelihood of Success on the Merits

"A federal court sitting in diversity must apply the choice-of-law rules of the forum state." *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022). Here, the Agreement is governed by the laws of Ohio, *see* Doc. 5-1, PageID 77, and Ohio's "choice-of-law principles strongly favor upholding the chosen law of the contracting parties." *Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 715 (6th Cir. 2015) (citation omitted).

The complaint in this case states claims for misappropriation of trade secrets under state and federal law, breach of contract, conversion and breach of fiduciary duty. Because, as discussed below, the Court finds that MCC has a strong likelihood of success on the merits as to their claims for breach of contract and misappropriation of trade secrets, the Court need not address the likelihood of success on their remaining claims at this time.

### i. Breach of Contract

To establish a claim for breach of contract under Ohio law, a plaintiff must prove: (1) the existence of a valid contract; (2) the performance by the plaintiff; (3) breach or failure by the defendant; and (4) resulting damages. *Amicus Miami of Ohio, LLC v. Kacachos*, No. 1:22-CV-355, 2022 WL 4473465, at *2 (S.D. Ohio Sept. 26, 2022).

"A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *QFS Transportation, LLC v. Huguely*, No. 1:21-CV-00769, 2022 WL 395756, at *4 (S.D. Ohio Feb. 9, 2022) (quoting *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975)). Likewise, "[a]n employer has a legitimate interest in limiting not only a former employee's ability to take advantage of personal relationships the employee has developed

4

while representing the employer to the employer's established client, but also in preventing a former employee from using his former employer's customer lists or contacts to solicit new customers." *UZ Engineered Prods. Co. v. Midwest Motor Supply Co.*, 770 N.E.2d 1068, 1081 (Ohio Ct. App. 2001) (citing *Rogers v. Runfola & Assocs.*, 57 Ohio St. 3d 5, 8–9 (1991). Restrictive covenants that are of one-year duration have been upheld as reasonable. *See Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 852–53 (S.D. Ohio 2000) (citing *Rogers v. Runfola & Assoc.*, 565 N.E.2d 540, 544 (Ohio 1991)).

Based on the information before the Court at this time, MCC has a strong likelihood of success on their breach of contract claim. The current record supports the existence of an enforceable contract that contained the following relevant provisions:

> *Nonuse and Nondisclosure.* I agree that during and after my employment with the Company, I will hold in strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or disclose the Company Confidential Information to any third party without the prior written authorization of the CEO of the Company.
>
> *Non-Competition.* I agree that during the term of my employment with the Company and for a period of one (1) year immediately following the termination of my employment with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I shall not perform services for another entity engaging in the Business, whether as an officer, director, employee, contractor, or consultant, that are the same or substantially similar to the services I provided to the Company at any time during the last one (1) year before the termination of my employment with the Company.
>
> *Non-Solicitation of Customers.* I agree that for a period of one (1) year immediately following the termination of my employment with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I shall not solicit, or cause to be solicited any Customer for the purposes of conducting business that is competitive with or similar to the Business or for the purpose of disadvantaging the Company's business in any way.

Agreement, Ex. A, Doc. 7-1, PageID 118, ¶ 2B, PageID 123, ¶ 8A, B. Additionally, there is no evidence that MCC failed to perform its obligations under the Agreement.

The current record further supports a finding that Mr. Giuliani stands to perform services for Inovar that are the same or substantially similar to the services that he provided to MCC, in breach of the non-compete provision of the Agreement. While there is not yet evidence that shows he has solicited customers in breach of the non-solicitation provision, there is reason to believe that his role at Inovar may lead to such action.

Additionally, there is convincing evidence in the record that demonstrates he has already breached (or is at least poised to breach) the nonuse and nondisclosure provision. Mr. Giuliani allegedly downloaded confidential, proprietary, and trade secret information to an external storage device one day prior to resigning. Doc. 6, PageID 94, ¶ 14. And as discussed more fully below, MCC has adequately alleged that it will suffer harm as a result of Mr. Giuliani's breach of the Agreement. *See Proctor & Gamble v. Stoneham*, 140 Ohio App. 3d 260, 274 (2000) (threat of harm justifying injunctive relief exists where employee "with a detailed and comprehensive knowledge of an employer's trade secrets and confidential information" leaves employment and takes similar position with competitor).

ii. Misappropriation of Trade Secrets

"Because the definition and requirements of both the DTSA and OUSTA are essentially the same, the Court will consider these federal and state law claims together." *Mech. Constr. Managers, LLC v. Paschka*, No. 3:21-cv-203, 2022 WL 1591605, at *9 (S.D. Ohio May 19, 2022). "[T]o properly state a [] claim for injunctive relief [under DTSA], Plaintiff is required to show: (1) the existence of a protectable trade secret; and (2) misappropriation of the trade secret by defendant." *PPS Serv. Grp., LLC v. Eckert*, No. 1:18-CV-727, 2019 WL

6

3927232, at *3 (S.D. Ohio Aug. 20, 2019). "Similarly, to prevail on an OUTSA claim, a plaintiff must show 'by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret.'" *Id*. (quoting *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008)).

The "question of whether something is a trade secret is a question of fact to be determined by the trier of fact upon the greater weight of the evidence." *Handel's Enters., Inc. v. Schulenburg*, 765 Fed. Appx. 117, 123 (6th Cir. (2019) (quoting *Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003) (per curiam). Under both the DTSA and OUTSA, the definition of "trade secret" includes any "financial, business, scientific, technical, economic, or engineering information, . . . whether tangible or intangible. . . if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3); Ohio Rev. Code § 1333.61 (setting forth similar definition of trade secret). "Courts have expressly found that customer lists, pricing information, and other business information can constitute 'trade secrets' under the OUTSA provided the other requirements of that statute are met." *Shepard & Assocs. v. Lokring Tech., LLC*, No. 1:20-cv-2488, 2022 WL 312711, at *24–25 (N.D. Ohio Feb. 2, 2022) (collecting cases). The same is true under the DTSA. *Id.*

Here, MCC has a likelihood of success on the merits of their claims under the DTSA and the OUTSA. Despite the nonuse and nondisclosure provision set forth in the Agreement,

7

the present record suggests that Mr. Giuliani downloaded detailed pricing lists, customer lists, product specifications, and order histories to an external storage device on the eve of his resignation.[1] Doc. 6, PageID 94, ¶ 14; *see Shepard*, 2022 WL 312711 at *24–25 (finding likelihood of success on a misappropriation of trade secrets claim where defendant forwarded a contact list to his personal email on the eve of termination and retained the list thereafter). This information was "not generally known in the public domain or maintained in the same organized manner as done by MCC." Doc. 7, PageID 105. MCC takes measures to guard its valuable proprietary information by entering into non-disclosure and non-compete agreements with employees, utilizing "a confidential, secure computer network with restricted access," and restricting access to its facilities. *Id.* While there is no evidence in the present record that shows Mr. Giuliani has in fact used this information, there is an "actual threat of harm" justifying injunctive relief. *Stoneham*, 140 Ohio App. 3d at 274.

### b. Irreparable Harm

"Harm is irreparable if it 'is not fully compensable by money damages,'" *Ray Ins. Agency, Inc. v. Wolfe*, No. 2:19-CV-2766, 2019 WL 13198202, at *2 (S.D. Ohio July 3, 2019) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)), or "if the nature of the plaintiff's loss would make damages difficult to calculate." *RGIS, LLC v. Gerdes*, 817 F. App'x 158, 163 (6th Cir. 2020). "If the plaintiff isn't facing irreparable harm, there's no need to grant relief now as opposed to at the end of the lawsuit." *D.T.*, 942 F.3d at 326.

This Court agrees that MCC would suffer irreparable harm to customer goodwill and fair competition absent injunctive relief. The Sixth Circuit has found that "[t]he loss of

---

[1] Mr. Giuliani represents that he has since deleted all of the information that was downloaded onto to the external storage device, but that remains to be confirmed.

customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Basicomputer*, 973 F.2d at 512 (citations omitted); *see also Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) (pointing out that corresponding "harm [to] goodwill and competitive position . . . would be hard to compensate"); *AK Steel Corp. v. Miskovich*, No. 1:14CV174, 2014 WL 11881030, at *5 (S.D. Ohio Mar. 3, 2014) (finding that "loss of goodwill and fair competition is likely to irreparably harm an employer"). Mr. Giuliani built and maintained customer relationships as an account manager at MCC for more than six years, and now stands to benefit from those relationships in his new position at Inovar. Doc. 6, PageID 92–94, ¶ 7–8, 11.

Additionally, the Court finds that MCC would suffer irreparable harm due to the loss of confidential, proprietary, and trade secret information that Mr. Giuliani could use (if he has not done so already) to his benefit at Inovar. Courts have found that the loss of customer lists, strategic plans, and other corporate work product may constitute irreparable harm. *See, e.g.*, *Dayton Superior Corp. v. Yan*, No. 3:12-cv-380, 2012 WL 5497804, at *8 (S.D. Ohio Nov. 13, 2012) (finding irreparable injury justifying a TRO based on, among other things, a defendant's use of "pricing information, customer contacts, sales strategies, customer specifications and other information belonging to [plaintiff]"); *see also RGIS*, 817 F. App'x at 163 ("[T]he [district] court found that any disclosure of RGIS's trade secrets would harm its 'ability to compete with its competitors.' We have previously upheld similar findings of irreparable harm."). Mr. Giuliani allegedly downloaded information "for more than a dozen customers, including detailed pricing lists, customer lists, produce [*sic*] specifications, and

9

order histories," to an external storage device the day before submitting his resignation. Doc. 6, PageID 94, ¶ 14. This was confirmed by MCC's IT personnel and a third-party forensics investigator. *Id.* ¶ 14–15.

### c. Harm to Others and the Public Interest

The third and fourth factors weigh in favor of temporary injunctive relief. "[S]elf-inflicted harm to a [d]efendant does not preclude injunctive relief," and here, any harm that may befall Mr. Giuliani is attributable to his own conduct. *TWC Concrete LLC v. DeCarlo*, No. 1:23-cv-345, 2023 WL 4306121, at *5 (S.D. Ohio June 30, 2023) (citing *Cooey v. Taft*, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006). In his exit interview, MCC "expressly reminded [him] of his Agreement, and the obligations contained in it, and advised him that he was not permitted to take a similar position at a direct competitor." Aff., Doc. 6, PageID 94, ¶ 12. During that meeting, Mr. Giuliani "admitted that he had shared his Agreement with Inovar." *Id.* Thus any harm to Inovar that may result should have been expected, and does not outweigh the irreparable harm that MCC would suffer absent injunctive relief. *See Seaman Corp. v. Flaherty*, 5:20-CV-443, 2020 WL 4597323, at *6 (N.D. Ohio Mar. 3, 2020).

Additionally, "[t]he public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts," *Schulenburg*, 765 F. App'x at 125, and "by having reasonable non-competition agreements enforced and preventing unfair competition." *AK Steel Corp. v. Miskovich*, No. 1:14-cv-174, 2014 WL 11881030, at *5 (S.D. Ohio Mar. 3, 2014). And, because trade secret laws "maintain the standards of commercial ethics and the encouragement of invention, as well as the protection of the substantial investment of employers in their proprietary information," *ALTA Analytics, Inc. v. Muuss,* 75

10

F. Supp. 2d 773, 786 (S.D. Ohio 1999) (citation omitted), the public interest is served by discouraging trade secret misappropriation *See Avery Dennison*, 118 F. Supp. 2d at 855.

### III. CONCLUSION

Accordingly, for these reasons, the Court hereby **ORDERS** that Mr. Giuliani be enjoined during the pendency of the Temporary Restraining Order as follows:

1. Mr. Giuliani shall not directly or indirectly use, disclose, copy, or transmit MCC's confidential or trade secret information for any purpose, including engaging in competition with MCC, competing against MCC, or soliciting MCC's customers, vendors, consultants, suppliers, and employees;

2. Mr. Giuliani may continue to receive training from Inovar Packaging, but may not perform in a sales role, or provide any other services to Inovar. This prohibition includes contacting customers or prospective customers, or soliciting any of MCC's current or former customers, vendors, suppliers, and employees;

3. Mr. Giuliani shall return to MCC, within twenty-four (24) hours of entry of this Temporary Restraining Order, all originals, copies, and reproductions in any form whatsoever, of any record or documents containing, in whole or in part, any of MCC's confidential information, as defined by Mr. Giuliani's contractual agreements with MCC;

4. Mr. Giuliani shall not tamper with or modify, and shall instead preserve any and all hard drives of any computer in his possession or which he has used in the last calendar year and any removable or portable media drives, such as USB devices and thumb drives in his possession that he used at any

time during or in connection with his work at MCC, and Mr. Giuliani shall produce these hard drives and storage devices to MCC within twenty-four (24) hours of entry of the Temporary Restraining Order. This includes, but is not limited to, the Seagate device referenced in MCC's Complaint; and

5. Mr. Giuliani, within 24 hours of the entry of the Temporary Restraining Order, shall send the laptop computer issued to him by Inovar to Garrett Discovery, 505 West University, Champaign, Illinois 61820 for a forensic examination.

Mr. Giuliani has not alleged that he will suffer any particularized harm during the pendency of this short-term injunctive relief. Accordingly, the Court finds that no security is necessary at this juncture. Fed. R. Civ. P. 65(c). This matter remains set for a Preliminary Injunction Hearing on February 27, 2024.

**IT IS SO ORDERED.**

February 20, 2024

Jeffery P. Hopkins
United States District Judge